WEST INDIA OIL Co. (P.R.), Complainant and Appellee, *v.* RAFAEL SANCHO BONET, TREASURER OF PUERTO RICO, Defendant and Appellant.

No. 7600.  Argued April 20, 1938.—Decided May 10, 1939.

696

B. *Fernández García,* Attorney General, and *E. Córdova Díaz,* Assistant Attorney General, for appellant. *James R. Beverley, R. Castro Fernández* and *J. López Baralt* for appellee.

MR. JUSTICE TRAVIESO delivered the opinion of the Court.

This suit was filed under the provisions of Act No. 47 of April 25, 1931, to obtain a declaratory judgment in regard to the rights of the litigants.

The plaintiff, the West India Oil Company (P. R.), is a domestic corporation engaged in importing, purchasing and selling oil and products derived from the same. In connection with said business and to facilitate the sale and delivery of said products to purchasers, the plaintiff set up and maintained a bonded tank in the city of San Juan, Puerto Rico, in keeping with the Federal statutes (43 Stat. 743; 19 U.S. C.A., sec. 1555); said tank was used to receive and deposit fuel oil brought from foreign countries to Puerto Rico. The oil thus deposited remains in the tank for an undetermined period of time until it is (*a*) re-exported to a foreign country; or (*b*) delivered to the steamers that purchase it to be used as fuel for their engines; or (*c*) delivered to purchasers for use in Puerto Rico. While it remains in the bonded tank, the oil is under the control of the customs service of the Federal Government.

From December 1932, through August 1935, the plaintiff corporation drew about 46,000,000 gallons of fuel oil from said bonded tank and delivered them to the steamers which had purchased it for use in their trips to the Continent and to foreign countries.

The Treasurer of Puerto Rico maintains that the oil thus delivered to said steamers in Puerto Rico is subject to a tax of 2 per cent ad valorem, which in the present case amounts to $26,500, more or less. To impose said tax the Treasurer relies on the provisions of section 62 of the Internal Revenue Act of Puerto Rico, as it was amended by Act No. 17 of June 3, 1927, which reads as follows:

"Section 62.—There shall be levied and collected, once only, on the sale of any articles the object of commerce, not taxed under Section 16 of this Act or exempted from taxation as provided in Section 83 of the same, *and at the time of sale in Porto Rico,* a tax of two (2) per cent on the price or value of the daily sales of such articles, *whether such sales are for cash or on credit,* which tax shall be paid at the end of each month *by the person making such sale."* (Italics supplied.)

The plaintiff corporation maintains that section 62, *supra*, is not applicable to the oil taken out of the tank and delivered to the steamers, for the following reasons:

1st. Because said oil never enters into Puerto Rico nor does it become property within the territory, since said tank is somewhat in the nature of a *tax free zone*, not subject to the control of the Insular Government but under the exclusive control of the Federal Government, said oil never being subject to the tax laws of Puerto Rico.

2d. Because the tax imposed would be an import tax, prohibited by section 3 of the Organic Act of Puerto Rico.

3d. Because said tax is a direct burden on interstate and foreign commerce and as such is not included in the powers of the Insular Legislature.

4th. Because the fuel oil was still in foreign commerce when it was delivered to the steamers for use on the high seas.

The District Court of San Juan decided that said oil had never acquired a taxable *situs* in Puerto Rico and therefore rendered judgment in favor of plaintiff. The defendant appealed. He alleges that the district court has erred specifically in upholding each of the four reasons set forth by the plaintiff corporation against the imposition of the tax; and has committed a fifth error, in awarding costs to plaintiff.

To complete the above findings of fact we should state that according to the testimony of Mr. Lee, Assistant Manager of the plaintiff corporation, the contracts for the sale of oil are signed in New York by the steamship company and the Standard Oil Co. of New York; the latter notifies the plaintiff corporation that said contracts have been signed and the oil is delivered by said corporation to any ship of the purchaser steamship line that requests it. Mr. Lee also testified that when a delivery of oil is to be made, the plaintiff notifies the Customs office, which inspects the valves of the tank to see that the seals have not been broken and supervises the delivery and notes the amount delivered; that the

bills and payments are made in New York; that when the oil comes from Aruba the amount to be used locally is nowhere stated, nor the amount that is to be delivered to the ships, nor the amount that is to be re-exported, but that it all comes together and is thus deposited in the tanks; that the tanks are situated in the Ward Puerta de Tierra, of San Juan; that when delivery of the oil is made to the ships *the contract of sale is entered into in New York, but the oil is delivered in San Juan.*

1. The lower court in deciding the case accepted as an unquestionable legal doctrine the allegations of the plaintiff corporation that a Bonded Tank belonging, as in this case, to a private corporation becomes a tax-free zone or a Federal Zone and as such is beyond the control or jurisdiction of the Insular Government, merely because employees of the Federal Government supervise and inspect the deposit and withdrawal of the fuel-oil. Having accepted said doctrine the judge of the lower court said:

"The Bonded Tanks are under the control of the Federal Government. This is indisputable and the defendant accepts it as a fact. It is clear that while the fuel oil is in the Bonded Tank it is not subject to any tax whatsoever by the territory of Puerto Rico. . . . We have previously seen that in order that a tax be valid it is necessary that the object taxed be within the Insular jurisdiction. While the object does not become a part of the property of the taxpayer in the Territory of Puerto Rico it is out of the jurisdiction. . . . The mere fact that the tank is within our territorial waters does not mean that our Legislature has jurisdiction to impose a tax on goods deposited in said tanks. We do not think that by the mere fact of being there it has acquired a taxable *situs* which would authorize the Government of Puerto Rico to impose a tax upon it."

Let us examine the jurisprudence cited by the lower court to uphold its decision.

In the case of *Surplus Trading Co.* v. *Cook*, 281 U. S. 647, 74 L. ed. 109, the State of Arkansas imposed a tax on a number of woolen blankets that the corporation Surplus Trading

Co. bought from the Government of the United States and which were deposited in a military warehouse at "Camp Pike." Said corporation refused to pay the tax and alleged that "the personal property on which it was laid was located limits of Pulaski County—the lands of which had been purply station of the United States lying within the exterior · limits of Pulaski County—the lands in which had been purchased by the United States, with the consent of the legislature of the State, for the purpose of establishing, erecting and maintaining such an army station;" and that the tax laws of the State could not be applied to property so located, being in violation of Article 1, paragraph 8, clause 17, of the Federal Constitution, which gives Congress exclusive jurisdiction over lands bought by the Federal Government with the consent of the State Legislature, for the construction of forts, warehouses, arsenals, docks and other necessary buildings. In deciding that the tax imposed was illegal, the United States Supreme Court stated as follows:

"It is not unusual for the United States to own within a State lands which are set apart and used for public purposes. *Such ownership and use without more do not withdraw the lands from the jurisdiction of the State.* On the contrary, the lands remain part of her territory and within the operation of her laws, · save that the latter cannot affect the title of the United States or embarrass it in using the lands or interfere with its right of disposal."

The case was decided in favor of the corporation because of the fact that Camp Pike is a military reservation bought by the Federal Government with the consent of the Arkansas Legislature. Referring to military reservations on lands acquired without said consent from the state, the court said:

"If there be private property within such a reservation which is not held or used as an incident of military service it may be subjected to taxation like other private property within the State."

It is evident that the Federal jurisdiction supersedes the State authority and jurisdiction only when the lands have

been acquired by the Federal Government for one of the purposes enumerated in Article 1 of the Constitution, supra, and when the Legislature of the State has given its consent to the granting and to the surrender of its jurisdiction. See: *Com.* v. *Clary,* 8 Mass. 72; *Mitchell* v. *Tibbetts,* 17 Pick 298; *U. S.* v. *Cornell,* 2 Mason, 60, Fed. Cas. No. 14,867; *State ex rel. Jones* v. *Mack,* 62 Am. St. Rep. 811; *Ft. Leavenworth R. Co.* v. *Lowe,* 114 U. S. 525; *U. S.* v. *Unzeuta,* 281 U. S. 138, 74 L. ed. 761.

In the other case cited by the lower court, *Standard Oil Co.* v. *California,* 291 U. S. 242, 78 L. ed. 775, the State of California tried to apply a statute which imposed upon every distributor a tax on every gallon of gasoline "sold and delivered by him within this State," to a certain amount of gasoline sold and delivered by the Standard Oil Company to the Post Exchange of the San Francisco Penitentiary. The Supreme Court of the State upheld the tax. The Supreme Court of the United States reversed the judgment, saying:

"Considering these opinions, it seems plain that by the Act of 1897 California surrendered every possible claim of right to exercise legislative authority within the Presidio—put that area beyond the field of operation of her laws. Accordingly, her Legislature could not lay a tax upon transactions begun and concluded therein."

"A State can not legislate effectively concerning matters beyond her jurisdiction and within territory subject only to control by the United States."

See: Note, 74 L. ed. 761.

The case of *U. S.* v. *Unzeuta, supra,* deals, with a murder committed in a freight car within the limits of the military reservation of Fort Robinson, in the State of Nebraska. The Supreme Court upheld the exclusive jurisdiction of the Federal Government and in an opinion written by Chief Justice Hughes stated as follows:

"When the United States acquires title to lands, which are purchased by the consent of the legislature of the State within which they are situated 'for the erection of forts, magazines, arsenals, dock-

yards and other needful buildings,' (Const. Art. I, sec. 8) the Federal jurisdiction is exclusive of all State authority. With reference to land otherwise acquired, this Court said in *Font Leavenworth Railroad Company* v. *Lowe*, 114 U. S. 525, 539, 541, that a different rule applies, that is, that the land and the buildings erected thereon for the uses of the national government will be free from any such interference and jurisdiction of the State as would impair their effective use for the purposes for which the property was acquired.''

See: *People* v. *Suárez*, 51 P.R.R.—————.

After a thorough study of the above cited cases we feel bound to declare untenable the contention that a bonded tank belonging to and constructed on private property in Puerto Rico of a corporation, is a tax free zone or Federal property, over which the Insular Legislature has no jurisdiction whatsoever, for the only reason that employees of the Customs Service control and inspect the movement of the fuel oil deposited in said tank to facilitate the business of the corporation.

The question that we must consider and decide in this case is not whether or not the Insular Legislature is empowered or whether or not it has jurisdiction to impose a tax on fuel oil while deposited in bond in the tanks of the West India Oil Company. We find no allegation whatsoever in the complaint of said corporation to the effect that the Insular Treasurer has tried to impose such tax. The question before us may be expressed as follows:

Is the Treasurer of Puerto Rico legally authorized to impose and collect the 2 per cent tax provided for by Section 62, *supra,* on the price of the fuel oil that the plaintiff corporation bound itself to sell by a contract entered into in New York which oil was to be delivered at the dock in Puerto Rico by pumping it from the tanks to the ships of the purchaser corporations?

The tax to which Section 62, *supra,* refers is a sales tax that the Treasurer of Puerto Rico is bound to impose and collect once only on the sale of any object of commerce.

*Flores Alvarez & Co.* v. *Gallardo,* 36 P.R.R. 105. According to said statute the above tax should be imposed and collected "at the time of sale in Puerto Rico." The decision of the judicial problem which has been brought before us depends for its solution on the interpretation that we give to the phrase "at the time of sale in Puerto Rico."

We accept as an indisputable premise that the fuel oil is an article of commerce the sale of which if it is consummated in Puerto Rico is subject to the payment of the tax. And if the other premise, that is that the sale of the oil was consummated in Puerto Rico is established, we would be forced to the inevitable conclusion that the Treasurer was correct in applying the statute to it.

The appellee corporation sustains that as the contract of sale was entered into, the bills made and the oil paid for in New York, the sale must be considered *as consummated* in New York and not in Puerto Rico; and that the fact that at the moment when the sale was carried out the oil was in Puerto Rico, where delivery was made to the purchaser, does not authorize the Treasurer to impose the 2 per cent tax on said sale.

The Treasurer argues in opposition that for the purposes of a tax a sale *is consummated* where the delivery of the thing sold is made and that the place where the contract is signed or the price stipulated is paid is of no importance whatsoever.

The complainant corporation has not considered it necessary to show us copies of the contracts entered into in New York between it and the steamship companies. In fact it has not even referred to said contracts in its amended petition. The fact of the existence of said contracts was first brought forth in the testimony of Mr. Lee, to which we have referred. And if we accept said testimony in its entirety, the only thing that we can get out of it is that they were simple contracts entered into and signed in New York for the sale of a cer-

tain amount of fuel oil situated in Puerto Rico, which was to be taken from the tanks of the corporation, measured and delivered at the dock in Puerto Rico to the ships of the purchasers when these should request it.

We have no doubts that the contracts between the oil corporation and the steamship companies were perfected from the moment they were signed in New York, the contracting parties having agreed as to the thing object of the contract and as to the purchase price, without requiring the previous delivery of one or the other. Section 1339 of the Civil Code, 1930 ed. The agreement in regard to the object and the purchase price is sufficient to constitute a valid contract of sale binding as between the purchaser and the vendor, the former having an action to demand the delivery of the thing sold to him and the latter to claim the payment of the price agreed upon.

However, we are not trying to determine the rights and obligations as between the purchaser and the vendor, but the obligation that a vendor who consummates a sale of an object of commerce within the limit of a state enters into with a third party, the State.

Manresa, in his Commentaries to the Spanish Civil Code, in dealing with *the perfection* and *the consummation* of a contract of sale says as follows:

"From the moment of agreement, and without any other requisite, the contract, we repeat, is perfected and the obligations of the parties arise; but the transmission of the property does not exist until the thing has been delivered. The delivery of the thing refers to the consummation; the Section which we are studying merely states the moment in which the contract is perfected.

. . . . . . . .

"We said that the generally accepted rule sustains the doctrine of the transmission of the property merely by agreement and without the necessity of the previous delivery of possession, and that, *on the contrary, our code still requires said requisite to consider the property transmitted.*" (Italics supplied.) 10 Manresa, page 60, 2d ed.

And the commentator Scaevola says:

"All these considerations lead us to declare as a consequence *that the transmission of the title of the thing sold from the vendor to the purchaser takes effect at the time when the contract is consummated and not simply when it is perfected;*" (Italics supplied.) 23 Scaevola, 318.

The same doctrine has been upheld by this court in *Olivari* v. *Bartolomei,* 2 Judgments of the Supreme Court of Puerto Rico 79; *Capó* v. *S. A. Panzardi & Co.,* 44 P.R.R. 225; and *Benítez Flores* v. *Llompart,* 50 P.R.R.____. See: Section 549 of the Civil Code, 1930 ed.

The jurisprudence in the States is to the same effect:

"The contract for the presses, while made in New York, was to be executed and consummated in Louisiana. . . . The presses and their appurtenances remained the property of the plaintiff and at their risk until thus tested and accepted. Hence the delivery of the presses was to be accomplished here. The contract therefore must be held to be a Louisiana contract, and the presses subject to the lien accorded by our law to the vendor."

*De la Vergne Refrig. Mach. Co.* v. *New Orleans & W. R. Co.,* 26 S. 455. See: 16 S. 764.

"A sale is deemed to be made at the place where it is executed by a transfer of the property in the goods from the seller to the buyer." 55 C. J. 213.

See: *Fred Miller Brewing Co.* v. *De France,* 57 N. W. 959; *Weil* v. *Golden,* 141 Mass. 364, 6 N. E. 229.

"Accordingly, in the absence of any agreement of the parties or any special circumstances to the contrary, if an order is given 'for goods and is accepted by delivery of the goods to a carrier for shipment with the intention of transferring the property therein to the buyer, *the place of shipment is the place of sale, by the law of which the sale is governed*". 55 C. J. 213. (Italics supplied.)

See: *Peo.* v. *Hill Top Metals M. Co.,* 133 N. E. 303. *Peo.* v. *Young,* 237 Ill. 196, 86 N. E. 589. *City of Carthage* v. *Duvall,* 202 Ill. 234, 60 N. E. 1099. *Phoenix Packing Co.* v. *Hum-*

*phrey Ball Co.*, 108 Pac. 952. *Claflin* v. *Mayer*, 41 La. Ann. 1048, 7 S. 139. ;

In the present case the title or right of property could not be transmitted to the purchaser until the oil was taken from the tank, measured and delivered to the ships.

"But the acceptance of the delivery order will not transfer the property if something remains to be done, such as weighing or measuring, to identify the goods or ascertain the quantity sold." 55 C. J. 562. See pages 530–542.

See: *Iron City Grain Co.* v. *Arnold*, 215 Ala. 543, 112 So. 123. *López & Morán* v. *Sobrinos de Ezquiaga*, 34 P.R.R. 75.

In accordance with the authorities cited we must arrive at the conclusion that the contract or promise of sale entered into in New York was not consummated until the oil was extracted from the tank, measured and delivered to the ships in their tanks.

The plaintiff corporation argues that in providing that the tax on the sales shall be imposed and collected "at the time of sale in Puerto Rico" the intention of the legislator was to impose and collect a tax when the contract of sale was entered into or perfected and not when the sale is consummated by the delivery of the object.

In the dictionary of the Spanish Language we find the following definitions:

VERIFY—(From the Latin *verus*, true and facere, to do.) 3. Realize, effect.

EFFECT—(From the Latin, *effectus*, effect)—To bring to pass, to execute.

REALIZE—Verify, to accomplish.

CONSUMMATE—To carry out something fully.

It is evident that the verbs "verify," "effect," "realize," and "consummate," all express the same idea or concept: the carrying out or accomplishment of an act.

We are, therefore, of the opinion, and we so decide, that in providing in Section 62, *supra*, that the 2% tax shall be

imposed and collected "at the time of sale in Puerto Rico" and said tax shall be paid "by the person *making* such sale," the legislator had the intent to and meant to impose the tax at the place of and at the moment when the sale was consummated by the delivery to the purchaser of the thing sold, without taking the manner of paying the purchase price into consideration, since the tax is made applicable to all sales whether "for cash or on credit." To sustain the opposite would be to make the evasion of the tax a simple matter, in New York as well as in Puerto Rico, since the courts of that state have held that the tax may not be levied when the thing object of the contract is delivered out of the city of New York even though the contract is entered into or signed in said city. *United Artists Corporation* v. *Taylor,* 7 N. E. (2d) 254, 273 N. Y. 334, affirming 248 App. Div. 207.

2. The contention of the plaintiff corporation that the tax levied by the Treasurer on the oil delivered to the ships is an export duty prohibited by Section 3 of the Organic Act of Puerto Rico is in our opinion untenable.

"To export" means to send goods and merchandise from one country to another. "Export" as a noun signifies the object exported. Generally, as used in the Constitution and laws of the United States, the transportation of goods from this country to a foreign country. The term "exportation" is defined in Corpus Juris as follows:

"A severance of goods from the mass of things belonging to this country with an intention of uniting them to the mass of things belonging to some foreign country; the act of carrying or sending merchandise abroad; . . . 25 C. J. 217.

In *Swan etc. Co.* v. *U. S.,* 190 U. S. 143, 47 L. ed. 984, the following was said:

"It cannot mean simply a carrying out of the country. . . . Nor would the mere fact that there was no purpose of return justify the use of the word 'export'. Coal placed on a steamer in San Francisco to be consumed in propelling that steamer to San Diego would

never be so designated. Another country or State as the intended destination of the goods is essential to the idea of exportation.''

The plaintiff corporation has invoked the commerce clause of the Federal Constitution, alleging that the tax that the Treasurer attempts to levy and collect on the oil delivered in Puerto Rico to the ships "constitutes a direct burden on interstate and foreign commerce and therefore the Legislature of Puerto Rico has no authority to impose said tax.''

We have examined the Federal jurisprudence on this point with the following results.

In *Kelley v. Rhoads*, 188 U. S. 1, 4 L. ed. 359, the plaintiff was taking his herd of sheep from the Territory of Utah to the State of Nebraska crossing through the State of Wyoming. While crossing said state, the sheep pastured in the fields along the way. The State of Wyoming imposed and collected a tax from the plaintiff in keeping with a statute that provided that all live stock brought into the state to pasture in its fields should pay a tax for the fiscal year during which it was brought into the state. The plaintiff invoked the protection of the commerce clause and alleged that his sheep were in Wyoming, *in transitu*, as interstate commerce and were not subject to the tax. The Supreme Court so held, and in its opinion, after examining the foregoing jurisprudence, said:

"The law upon this subject, so far as it concerns interference with interstate commerce, is settled by several cases in this court, which hold that property actually in transit is exempt from local taxation, although if it be stored for an indefinite time during such transit, at least for other than natural causes, or lack of facilities for immediate transportation, it may be lawfully assessed by the local authorities. (Citations.)

"The substance of these cases is that, while the property is at rest for an indefinite time awaiting transportation, or awaiting a sale at its place of destination, or at an intermediate point, it is subject to taxation. But if it be actually in transit to another State, it becomes the subject of interstate commerce and is exempt from local assessment.''

In *American Steel & Wire Co.* v. *Speed,* 192 U. S. 500, 48 L. ed. 538, the plaintiff, a corporation of the State of New Jersey engaged in the manufacturing of wire, nails, etc. in its factories in various states, in order to facilitate the sale and delivery of its products, chose the city of Memphis in the State of Tennessee, as its distribution point. On arriving there its products were deposited in a warehouse of a transportation company which delivered them to the persons to whom the plaintiff sold them. The State of Tennessee levied a tax on said products and the corporation refused to pay it, alleging that the goods were in transit in Tennessee to be delivered to its customers and that the tax which was being levied was in violation of the commerce clause of the Federal Constitution. The Federal Supreme Court upheld the validity of the tax and said:

"With these facts in hand we are of opinion that the court below was right in deciding that the goods were not in transit, but, on the contrary, had reached their destination at Memphis, and were there held in store at the risk of the Steel Company, to be sold and delivered as contracts for that purpose were completely consummated."

See: *General Oil Co.* v. *Crain,* 209 U. S. 211, 52 L. ed. 754; *Susquehanna Coal Co.* v. *South Amboy,* 228 U. S. 665; *Bacon* v. *Illinois,* 227 U. S. 504; *State* v. *Maxwell Motor Sales Corporation,* 171 N. W. (Minnesota) 566; 61 C. J. 241.

In our opinion the tax which the Treasurer is attempting to levy and collect is not in conflict with the Commerce Clause of the National Constitution.

The fourth and last contention of the plaintiff corporation is that "the fuel oil was still in foreign commerce when it was delivered to the ships to be used on the high seas."

We have hereinbefore, stated that the Treasurer did not and does not attempt to levy a sales tax on the fuel oil while it is still deposited in the bonded tank, under the control and supervision of the customs service. If he were attempting such a thing the case would be easy to decide, since such a

tax would be a clear violation of Article 1, Section 10, Paragraph 3, of the Federal Constitution, which prohibits the states from levying taxes or duties on imports or exports.

The Supreme Court of the United States in *American Steel & Wire Co.* v. *Speed, supra,* clearly established the difference between imports from foreign countries and those from one state to another, saying:

"Since *Brown* v. *Maryland,* 12 Wheat. 419, 6 L. ed. 684, it has not been open to question that taxation imposed by the States upon imported goods, whether levied directly on the goods imported or indirectly by burdening the right to dispose of them, is repugnant to that provision of the Constitution providing that 'No State shall, without the consent of the Congress, lay any imposts or duties on imports or exports.' Article I, sec. 10, paragraph 3. And *Brown* v. *Maryland* also settled that where goods were imported they preserved their character, as imports, and were therefore not subject to either direct or indirect state taxation *as long as they were unsold in the original packages in which they were imported.* A recent case referring to the authorities and restating this elementary doctrine is *May* v. *New Orleans,* 178 U. S. 496, 44 L. ed. 1165, 20 Sup. Ct. Rep. 976. Assuming that the goods concerning which the state taxes in this case were levied were in the original packages and had not been sold, if the bringing of the goods into Tennessee from another State constituted an importation, in the constitutional signification of that word, it is clear they could not be directly or indirectly taxed. But the goods not having been brought from abroad, they were not imported in the legal sense and were subject to state taxation after they had reached their destination and whilst held in the State for sale. . . . The several States, therefore, not being controlled as to such merchandise by the prohibition against the taxation of imports, it was held that the States had the power, after the goods had reached their destination and were held for sale, to tax them, without discrimination, like other property situated within the State.''

The point involved in *Brown* v. *Maryland, supra,* was whether or not without violating the Constitution a State may impose the condition of taking out a license at a cost of $50 upon an importer of foreign goods before he may sell the goods so imported. The Supreme Court in an opinion of

its Chief Justice Mr. Marshall held that said tax was unconstitutional because it was an import duty. From the opinion of that eminent jurist we copy as follows:

"But while we admit that sound principles of construction ought to restrain all courts from carrying the words of the prohibition beyond the object the constitution is intended to secure; that there must be a point of time when the prohibition ceases, and the power of the state to tax commences; we cannot admit, that this point of time is the instant that the articles enter the country. It is, we think, obvious, that this construction would defeat the prohibition.

. . . . . . . .

It is sufficient for the present to say, generally, that when the importer has so acted upon the thing imported, that it has become incorporated and mixed up with the mass of property in the country, it has, perhaps, lost its distinctive character as an import, and has become subject to the taxing power of the state; *but while remaining the property of the importer, in his warehouse, in the original form or package in which it was imported a tax upon it is too plainly a duty on imports, to escape the prohibition in the constitution.*" (Italics supplied.)

Applying the rules established in the cases we have cited to the facts in the present case, we must necessarily hold that when the importer took from the bonded tank a certain number of gallons of oil and delivered them to a ship at the dock in Puerto Rico, to consummate a sale already agreed upon, said sale was subject to the tax levied by Section 62 of the Internal Revenue Law, supra; that the oil thus sold, extracted and delivered by the importer lost its character as an import and came into Puerto Rico as an object of commerce and from that moment on was subject to the insular fiscal jurisdiction (*West India Oil Co.* v. *Gallardo,* 6 F (2d) 523); that the fact that the oil has been delivered to a ship which is going to use it in its trips in interstate or international commerce does not make the oil an export, since said product was not consigned to any foreign or national port (*Swan & Finch Co.* v. *U. S.,* supra); that the mere purchase of supplies or equipment which are to be used in a business

in interstate commerce does not so confound said purchase with that business as to exempt it from the payment of the tax levied by the insular law equally on all sales carried out or consummated within its jurisdiction (*Eastern Air Transport v. Tax Comm.*, 285 U. S. 147); and finally that as the delivery of the oil was made at the wharf, in the San Juan harbor, the sale was consummated within the fiscal jurisdiction of Puerto Rico and was, therefore, subject to the payment of the 2% tax, which being a sales tax is in the nature of an excise tax and not a property tax. (*Gromer v. Standard Dredging Co.*, 224 U. S. 362.)

Since no violation of a Federal statute has been invoked which would give ships engaged in interstate or international commerce the privilege of buying, or oil corporations, of selling, within the limits of a State, objects of commerce, without having to pay the local excise taxes on sales carried out within the limits of the state, we must hold that the West India Oil Co. is legally bound to pay the sum claimed by the appellant Treasurer. To decide otherwise would be to make the act discriminatory against the other merchants engaged in the same business.

For the above reasons the judgment appealed from should be reversed, without any award of costs.

Mr. Justice Wolf dissented.

Mr. Justice De Jesús took no part in the decision of this case.